**TO: Clerk's Office**
    **UNITED STATES DISTRICT COURT**
    **EASTERN DISTRICT OF NEW YORK**



    **APPLICATION FOR LEAVE**
  **TO FILE DOCUMENT UNDER SEAL**

*********************************

United States

       -v.-

Raymond Kohut,

      20-M-692

    Docket Number

*********************************

SUBMITTED BY: Plaintiff____ Defendant____ DOJ ✓
Name: Mark E. Bini
Firm Name: U.S. Attorney's Office, E.D.N.Y.
Address: 271 Cadman Plaza East
        Brooklyn, New York 11201
Phone Number: (718) 254-8761
E-Mail Address: mark.bini@usdoj.gov

INDICATE UPON THE PUBLIC DOCKET SHEET: YES ___ NO ✓
**If yes, state description of document to be entered on docket sheet:**

_____

_____

_____

**A) If pursuant to a prior Court Order:**
Docket Number of Case in Which Entered:_____
Judge/Magistrate Judge:_____
Date Entered:_____

**B) If a new application,** the statute, regulation, or other legal basis that authorizes filing under seal

The government's investigation is not yet known to the public, and public revelation could seriously jeopardize the investigation.

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE, AND MAY NOT BE UNSEALED UNLESS ORDERED BY THE COURT.**

DATED: Brooklyn            , NEW YORK

   *Lois Bloom*    8/18/20

**U.S. MAGISTRATE JUDGE**

RECEIVED IN CLERK'S OFFICE_____
                         DATE

**MANDATORY CERTIFICATION OF SERVICE:**
**A.)** ___ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ___ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation:_____; or **C.)** ✓ This is a criminal document submitted, and flight public safety, or security are significant concerns. (Check one)

   08/18/2020           *Mark E. Bini*
      DATE                   SIGNATURE

AES/DCP/CJC:MEB/AS
F. #2019R01460

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

- against -

RAYMOND KOHUT,

                   Defendant.

– – – – – – – – – – – – – – – – – X

20-M-692

TO BE FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(T. 18, U.S.C., § 1956)

EASTERN DISTRICT OF NEW YORK, SS:

            JAMES KELLEY, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and

acting as such.

            Upon information and belief, in or about and between 2012 and the present,

both dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendant RAYMOND KOHUT, together with others, did knowingly and

intentionally conspire to transport, transmit and transfer and attempt to transport, transmit

and transfer monetary instruments and funds from a place in the United States to and through

a place outside the United States and to a place in the United States from and through a place

outside the United States:

            (a)      with the intent to promote the carrying on of one or more specified

unlawful activities, to wit, (i) felony violations of the Foreign Corrupt Practices Act

("FCPA"), in violation of Title 15, United States Code, Sections 78dd-2 and 78dd-3, and (ii) offenses against a foreign nation involving bribery of a public official, in violation of Articles 280 and 285 of the Ecuadorian Penal Code, contrary to Title 18, United States Code, Section 1956(a)(2)(A) (collectively, the "Specified Unlawful Activities"); and

(b)      knowing that the monetary instruments or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Section 1956(h))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the FBI.  I have been an FBI Special Agent since January 2016.  I am currently assigned to the international corruption squad ("ICU"), a group that investigates, among other things, violations of the FCPA, international money laundering and kleptocracy.  Prior to my assignment with the ICU, I was assigned to the South Florida Violent Crime and Fugitive Task Force for approximately three years.  As part of my work at the FBI, I have received training regarding fraud and white collar crimes,

---

[1]  Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.  In addition, where I rely on statements made by others, such statements are set forth in part and in sum and substance (in "substance") unless otherwise indicated.

including the FCPA and money laundering, and I have applied for and executed both search and arrest warrants.

2.     In addition to my training and experience, I am familiar with the information contained in this complaint and affidavit based upon, among other sources of evidence: (i) my own personal participation in the investigation, (ii) my review of documents, records, reports, and recorded phone calls, (iii) interviews of witnesses and (iv) discussions with other law enforcement personnel.

I.     BACKGROUND

   A.     Relevant Entities and Individuals

3.     Trading Company[2] was a European energy trading company with subsidiaries around the world, including in the United States.

4.     The defendant RAYMOND KOHUT was a citizen of Canada and resided in the Bahamas.  From approximately in and about 2009 to 2019, KOHUT worked as a manager and a crude oil trader in Houston and the Bahamas for Trading Company.  During a portion of that time, and currently, KOHUT worked as an agent and an independent contractor for an affiliate of Trading Company.

5.     Trading Company Employee #1 was a citizen of Spain and a resident of Switzerland.  Trading Company Employee #1 served as a Senior Trading Manager at Trading Company from approximately in or about and between 2009 to 2016.

---

[2] Certain entities' and individuals' names have been anonymized for the purposes of this criminal complaint.  The identity of each of these entities and individuals is known to me.

6.      Consultant #1 was a citizen of Ecuador, the United States and Spain and a resident of Miami, Florida.  Consultant #1, along with Consultant #2, defined below, exercised control over companies and bank accounts that were used to facilitate the payment of bribes to Ecuadorian officials to obtain and retain business for Trading Company and others.  Consultant #1 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

7.      Consultant #2 was a citizen of Ecuador and Spain and a relative of Consultant #1.  Consultant #2 provided consulting services, incorporated consulting businesses and opened bank accounts in the United States and elsewhere.  Consultant #2, along with Consultant #1, exercised control over companies and bank accounts that were used to facilitate the payment of bribes to Ecuadorian officials to obtain and retain business for Trading Company and others.  Consultant #2 was an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

8.      Consulting Company #1 was a company formed by Consultant #1 and Consultant #2 in Panama.  Consultant #1, together with Consultant #2 and others, used Consulting Company #1 to conceal and transmit bribe payments to Ecuadorian officials to obtain and retain business for Trading Company and others.

9.      Consulting Company #2 was a company formed by Consultant #1 and Consultant #2 in the British Virgin Islands.  Consultant #1, together with Consultant #2 and others, used Consulting Company #2 (together with Consulting Company #1, the

"Consulting Companies") to conceal and transmit bribe payments to Ecuadorian officials to obtain and retain business for Trading Company and others.

        10.    Empresa Publica de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned and state-controlled oil company of the Republic of Ecuador and performed a function that Ecuador treated as its own.  Petroecuador was an "instrumentality" of the Ecuadorian government as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

        11.    Ecuadorian Official #1 was a citizen of Ecuador, and served as a senior manager at Petroecuador from approximately in or about and between 2010 and May 2017. Ecuadorian Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2) and Section 78dd-3(f)(2)(A).

        12.    Ecuadorian Official #2 was a citizen of Ecuador, and served as a senior Ecuadorian official who had responsibilities in the energy sector from approximately in or about and between 2018 and March 2020.  Ecuadorian Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2) and Section 78dd-3(f)(2)(A).

        13.    Ecuadorian Official #3 was a citizen of Ecuador, and replaced Ecuadorian Official #1 as a senior manager at Petroecuador beginning in or about 2017. Ecuadorian Official #3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2) and Section 78dd-3(f)(2)(A).

        14.    The State-Owned Entities were two separate state-owned oil and gas entities located in Asia.

B.      The Foreign Corrupt Practices Act

15.      The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

C.      The Ecuadorian Bribery Law

16.      Article 285 of the 1971 Ecuadorian Penal Code, which was in effect until August 10, 2014, describes a basic offense of bribery and makes it a crime for "[a]ny public official and any person entrusted with a public service [to] accept[] an offer or promise, or receive[] a gift or present, in order to execute an unremunerated act within his or her employment or position, even if such act is just."

17.      Article 280 of the 2014 Ecuadorian Penal Code, which became effective in or about February 2014, makes it a crime for "[p]ublic servants . . . [to] receive or accept, themselves or through an intermediary, an undue economic benefit, whether to perform, to omit, to expedite, to delay or to condition matters related to their functions."  The same Ecuadorian law also makes it a crime for "[a]ny person who in any way offers, gives or promises a donation, gift, promise, advantage or undue economic benefit or other material good, to a public servant to perform, to omit, to expedite, to delay or to condition questions related to his or her function or to commit a crime."

II.     THE CONSPIRACY

18.     Based upon, among other evidence, information provided by two cooperating witnesses,[3] a review of bank records, recorded phone calls and meetings, corporate records, WhatsApp and email communications obtained from a variety of sources and involving the defendant RAYMOND KOHUT, and a review of contracts, agreements and other documents, I have learned that beginning in or about 2012, KOHUT agreed with Consultant #1, Consultant #2 and others to offer, promise and pay bribes to Ecuadorian officials in exchange for them assisting Trading Company and others with obtaining and retaining business related to Petroecuador.

19.     To promote the bribery scheme and in furtherance of the money laundering scheme, the defendant RAYMOND KOHUT agreed with others, including Consultant #1 and Consultant #2, to cause Trading Company to make international wire transfers from bank accounts controlled by Trading Company that were located in Singapore to bank accounts controlled by Consultant #1 and Consultant #2 that were located in Switzerland, Panama and the Cayman Islands.  After receiving those wire transfers, Consultant #1 and Consultant #2 would then transfer money via wire to accounts controlled

---

[3] The identity of each of the two cooperating witnesses is known to me.  The cooperating witnesses have entered into written cooperation agreements with the government and are expected to enter guilty pleas in the Eastern District of New York.  The cooperating witnesses have admitted to and will plead guilty to participating in one or more conspiracies to violate the FCPA and commit money laundering.  The witnesses are cooperating in the hope of receiving a more lenient sentence in connection with their cases.  The information provided by these cooperating witnesses has been corroborated by a review of bank records, e-mail and other messaging communications, and recorded phone calls gathered during the investigation.

by or associated with Ecuadorian officials, including Ecuadorian Official #1, Ecuadorian Official #2 and Ecuadorian Official #3. Most of the payments made by Trading Company were transferred through U.S. correspondent bank accounts, including correspondent bank accounts located in New York, New York, into offshore bank accounts for Consultant #1 and Consultant #2. Consultant #1 and Consultant #2, in part to conceal the proceeds of the illegal bribery scheme, then caused wire transfers to overseas accounts for the benefit of Ecuadorian officials. In sum, in or about and between 2012 and 2019, Consultant #1 and Consultant #2 caused bribes to be offered and paid on behalf of Trading Company totaling at least $22 million to Ecuadorian officials and others, including Ecuadorian Official #1, Ecuadorian Official #2 and Ecuadorian Official #3. To promote the bribery scheme, to conceal the proceeds of the illegal bribery scheme and in furtherance of the money laundering scheme, KOHUT, Consultant #1, Consultant #2 and others caused fake and fraudulent consulting agreements to be executed and fake and fraudulent invoices to be created. Specifically, based upon the information and evidence outlined above, I have learned the following:

A.   The Bribery and Money Laundering Schemes

20.     In or about and between 2009 and the present, Petroecuador and the State-Owned Entities entered into a series of contracts (the "Contracts"), in which the State-Owned Entities provided loans to Petroecuador secured by oil to be delivered over a period of years. Trading Company assisted in securing financing for approximately $5.4 billion in oil-backed loans from the State-Owned Entities to Petroecuador pursuant to the Contracts.

21.     In or about and between 2010 and 2017, Ecuadorian Official #1 was involved in the negotiation, management and oversight of the Contracts. In or about and

between 2017 and the present, Ecuadorian Official #2 and Ecuadorian Official #3 were involved in the management and oversight of the Contracts.

22.     Beginning in or about 2012, the defendant RAYMOND KOHUT, Consultant #1 and others, including, beginning in or about 2014, Consultant #2, agreed and understood that Consultant #1 would pay bribes to Ecuadorian officials to, among other things, secure improper advantages for Trading Company and others in obtaining business related to Petroecuador.  These improper advantages included, among other things, the receipt of confidential, non-public information about Petroecuador that assisted Consultant #1 and Consultant #2 in obtaining business for and directing business to Trading Company and others related to the Contracts.

23.     In or about and between 2012 and the present, Trading Company entered into agreements with the State-Owned Entities to sell the oil products delivered pursuant to the Contracts and to secure financing for those purchases from Petroecuador. Ecuadorian Official #1, Ecuadorian Official #2 and Ecuadorian Official #3 were aware of the marketing agreements between Trading Company and the State-Owned Entities.

24.     In furtherance of the bribery and money laundering schemes, the defendant RAYMOND KOHUT met with his co-conspirators, including Ecuadorian Official #1, Consultant #1 and Consultant #2, in the United States to discuss the Contracts.  For example, on or about May 26, 2016, KOHUT met with Ecuadorian Official #1, Consultant #1 and Consultant #2 at Consultant #1's house in Miami, Florida, to discuss elements of one of the Contracts.

9

B.      Payments to Promote and Conceal the Schemes

25.      In or about and between 2012 to 2017, to promote the bribery scheme, to conceal the illegal proceeds of the bribery scheme and in furtherance of the money laundering scheme, Consultant #1 and Consultant #2 executed several corrupt consulting agreements with the Singaporean subsidiary of Trading Company ("Trading Company Subsidiary").  Pursuant to the consulting agreements, Trading Company Subsidiary agreed to pay the Consulting Companies a commission per barrel of Ecuadorian oil product that was delivered in connection with the Contracts.  As part of the money laundering and bribery schemes, Consultant #1 and Consultant #2, while in the United States, emailed invoices to the attention of the defendant RAYMOND KOHUT and others at Trading Company Subsidiary and another Trading Company subsidiary in the Bahamas to request that Trading Company Subsidiary pay either Consulting Company #1 or Consulting Company #2 pursuant to the agreements.  The invoices listed as part of the transfer instructions specific correspondent banking accounts used by Consulting Company #1 or Consulting Company #2 that were located in the United States, including in New York, New York.

26.      Beginning in or about January 2013, to promote the bribery scheme and in furtherance of the bribery and money laundering schemes, Trading Company wired payments from accounts in Singapore, some of which traveled through the Eastern District of New York to correspondent accounts located in New York, New York, to bank accounts in the Cayman Islands controlled by Consultant #1 and Consultant #2.  The defendant RAYMOND KOHUT and others at Trading Company knew that these payments would be used, at least in part, to pay bribes to Ecuadorian officials.  Consultant #1 and Consultant #2,

10

intending, in part, to conceal the illicit proceeds of the bribery scheme, then caused to be wired a portion of the payments from the bank accounts in the Cayman Islands to bank accounts in Panama and Portugal for the benefit of Ecuadorian Official #1, Ecuadorian Official #2 and Ecuadorian Official #3.  Some of those payments traveled through the Eastern District of New York and to and from correspondent bank accounts in New York, New York.

27.     For example, financial records show that on or about and between August 21, 2017 and October 10, 2017, Consultant #1 and Consultant #2, on behalf of Trading Company, paid Ecuadorian Official #1 approximately $1,469,000 through a series of wire transfers.  Specifically, on or about August 21, 2017, for the benefit of Trading Company, Consultant #1 and Consultant #2 caused a wire transfer of approximately $1,650,000 from an offshore shell company bank account in the Cayman Islands controlled by Consultant #1 and Consultant #2, through a correspondent bank account located in New York, New York, to a bank account located in Puerto Rico controlled by Consultant #1 and Consultant #2.  On or about and between August 31, 2017 and October 10, 2017, Consultant #1 and Consultant #2 made two transfers totaling approximately $1,469,000 from the Puerto Rico-based bank account to a bank account in Portugal for the benefit of Ecuadorian Official #1.

28.     Beginning in or about 2017, to promote the bribery scheme and in furtherance of the bribery and money laundering schemes, Consultant #1 and Consultant #2 wired a portion of the payments they received from Trading Company from bank accounts in the Cayman Islands and Panama to bank accounts in Panama for the ultimate benefit of

11

Ecuadorian Official #2, Ecuadorian Official #3, and other Ecuadorian officials who had access to, and provided, among other things, non-public information to Consultant #1.

29.     For example, financial records show that on or about June 20, 2019, a payment of approximately $160,000 was transferred from an offshore shell company bank account located in the Cayman Islands controlled by Consultant #1 and Consultant #2 to a bank account in Panama controlled by an associate of Ecuadorian Official #2, for the benefit of Ecuadorian Official #2, through a correspondent bank account located in New York, New York.

30.     In or about and between 2012 and 2019, the defendant RAYMOND KOHUT, together with others, caused Trading Company to make payments totaling more than $70 million to bank accounts controlled by Consultant #1 and Consultant #2 that were intended to promote the bribery scheme and were in furtherance of the money laundering scheme.  Consultant #1 and Consultant #2 in turn, and in part to conceal the proceeds of the illegal bribery scheme, made bribe payments on behalf of Trading Company totaling at least $22 million to offshore bank accounts for the benefit of Ecuadorian officials and others, including to Ecuadorian Official #1, Ecuadorian Official #2 and Ecuadorian Official #3.

31.     In addition, beginning in or about 2015, Consultant #1 and Consultant #2 agreed to a request from the defendant RAYMOND KOHUT that Consultant #1 and Consultant #2 pay KOHUT kickbacks from the funds that Trading Company transferred to Consultant #1 and Consultant #2 in furtherance of the bribery and money laundering schemes.  In or about and between March 2015 and February 2017, KOHUT and Consultant #1 caused the transfer of at least $2.4 million to bank accounts controlled by KOHUT.

C.      Recorded Calls and Meetings

32.      In or about and between late 2019 and early 2020, compliance personnel at Trading Company requested to meet with Consultant #1 and Consultant #2 to discuss their business practices in Ecuador.  Consultant #1, Consultant #2 and the defendant RAYMOND KOHUT had multiple conversations, both by phone and in person, regarding, in substance, about how to conceal the bribery and money laundering schemes from compliance personnel.  During those conversations, KOHUT stated, in substance, that certain executives at Trading Company were aware of the bribery schemes.

33.      For example, on or about February 6, 2020, the defendant RAYMOND KOHUT spoke by phone to Consultant #1 while Consultant #1 was in the Eastern District of New York.  The call was recorded and both Consultant #1 and KOHUT spoke in Spanish. KOHUT and Consultant #1 discussed an upcoming meeting between Consultant #1 and Trading Company's executives and compliance personnel.  During the conversation, KOHUT agreed, in substance, that they should not to tell Trading Company's compliance personnel the truth about the payments Consultant #1 made to Petroecuador officials on behalf of Trading Company.  Specifically, Consultant #1 stated that a Trading Company executive who had previously been KOHUT's supervisor at Trading Company "shouldn't be saying that he doesn't know that a person from Petro[ecuador] is getting paid, oh God." KOHUT responded, "Of course!  No, no, no.  I know."

34.      In addition, on or about February 18, 2020, the defendant RAYMOND KOHUT met with Consultant #1 and Consultant #2 at a restaurant in Coral Gables, Florida. The meeting was recorded and Consultant #1, Consultant #2 and KOHUT spoke in Spanish.

13

During that meeting, KOHUT, Consultant #1 and Consultant #2 again discussed how Consultant #1 and Consultant #2 should handle inquiries by Trading Company's compliance personnel.  KOHUT commented, in substance, that when he asked his former supervisor at Trading Company whether the supervisor knew about payments to government officials, his supervisor said "I don't know if I want to know."  Later in the conversation, KOHUT stated that he believed that an executive of Trading Company "knew, one hundred percent." Consultant #1 agreed, stating "don't tell me that [the Trading Company executive] doesn't know what it is that we do here in. . . I mean . . . who we pay."  KOHUT responded, "Believe me . . . when I was there with [Trading Company executives], [the Trading Company executive] said, 'What's the big deal?'"

35.    Later during the same meeting, the defendant RAYMOND KOHUT also stated, in substance that while he had not specifically discussed the payments to Ecuadorian officials with another Trading Company executive, that executive "knows everything."

III.    CONCLUSION

WHEREFORE, your affiant respectfully requests that an arrest warrant be issued for the defendant RAYMOND KOHUT so that he may be dealt with according to law.

IT IS FURTHER REQUESTED that, because public filing of this document at this time could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, all papers submitted in support of this application, including the complaint and arrest warrant, be sealed until further order of the Court.

_____
JAMES KELLEY
Special Agent
Federal Bureau of Investigation

Sworn to before me telephonically this
18 th day of August, 2020

S/ Lois Bloom
_____
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

15