AES/DCP:MEB/AS
F. #2019R01465

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - -- - - -X

UNITED STATES OF AMERICA

    - against –

RAYMOND KOHUT,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

I N F O R M A T I O N

Cr. No. <u>21-115 (ENV)</u>
(T. 18, U.S.C., §§ 1956(h), 982(a)(1),
 982(b)(1) and 3551 <u>et</u> <u>seq</u>.; T. 21, U.S.C.,
 § 853(p))

THE UNITED STATES CHARGES:

       At all times relevant to this Information, unless otherwise stated:

I.      <u>The Defendant and Relevant Individuals and Entities</u>

          1.      Trading Company, the identity of which is known to the United States,

was a European energy trading company with subsidiaries around the world, including in the

United States.

          2.      The defendant RAYMOND KOHUT was a citizen of Canada who

primarily resided in Panama.  During the relevant time period, KOHUT lived in the Bahamas

and worked in business development for Trading Company as an employee, agent and an

independent contractor.

          3.      Trading Company Employee #1, an individual whose identity is known to

the United States, was a citizen of Spain and a resident of Switzerland.  Trading Company

Employee #1 served as a trader at Trading Company's headquarters from approximately 2009 to

2

2014, and as a senior manager at Trading Company's Bahamian subsidiary ("Bahamian Subsidiary") from approximately 2014 to 2017.

4.      Trading Company Employee #2, an individual whose identity is known to the United States, was a citizen of Spain and a resident of Switzerland. Trading Company Employee #2 served as a manager at Trading Company from approximately 2009 to 2018 at Trading Company's headquarters, its Singaporean subsidiary ("Singaporean Subsidiary") and the Bahamian Subsidiary.

5.      Empresa Publica de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned oil company of Ecuador. Petroecuador was wholly owned and controlled by the government of Ecuador and performed a function that Ecuador treated as its own. Petroecuador was an "instrumentality" of a foreign government, and Petroecuador's officers and employees were "foreign officials," as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

6.      Consultant #1, an individual whose identity is known to the United States, was a citizen of Ecuador, Spain and the United States, and a resident of Miami, Florida. Consultant #1 was an agent of Trading Company. Along with Consultant #2 (defined below), Consultant #1 exercised control over companies and bank accounts in the United States and elsewhere that were used to facilitate the payment of bribes to Ecuadorian government officials. Consultant #1 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2.

7.      Consultant #2, an individual whose identity is known to the United States, was a citizen of Ecuador and Spain. Consultant #2 was an agent of Trading Company and a

relative of Consultant #1.  Consultant #2 was an agent of Trading Company.  Along with Consultant #1, Consultant #2 provided consulting services, incorporated consulting businesses and opened bank accounts in the United States and elsewhere that were used to facilitate the payment of bribes to Ecuadorian officials.  Consultant #2 was an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

8.    Consulting Company #1 and Consulting Company #2, entities the identities of which are known to the United States, were companies formed by Consultant #1 and Consultant #2 in Panama and the British Virgin Islands, respectively.  Consultant #1, together with Consultant #2 and others, used Consulting Company #1 and Consulting Company #2 to pay and conceal bribe payments to Ecuadorian officials on behalf of, and to obtain and retain business for, Trading Company.

9.    Ecuadorian Official #1, an individual whose identity is known to the United States, was a citizen of Ecuador and served as a senior manager at Petroecuador from approximately 2010 to May 2017.  Ecuadorian Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

10.    Ecuadorian Official #2, an individual whose identity is known to the United States, was a citizen of Ecuador and served in the Ecuadorian government from approximately 2018 to March 2020.  Ecuadorian Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

11.    Ecuadorian Official #3, an individual whose identity is known to the United States, was a citizen of Ecuador and served as a senior manager at Petroecuador from approximately 2017 to November 2020.  Ecuadorian Official #3 was a "foreign official," as that

4

term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

12. The "State-Owned Entities," entities the identities of which are known to the United States, were two different state-owned oil and gas entities located in Asia.

II.    The Foreign Corrupt Practices Act

13. The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to corruptly offer, promise, authorize or pay money or anything of value, directly or indirectly, to a foreign government official for the purpose of obtaining or retaining business for, or directing business to, any person.

III.    The Bribery and Money Laundering Schemes

14. From in or about and between 2012 and August 2020, the defendant RAYMOND KOHUT, together with others, including Consultant #1, Consultant #2, Trading Company Employee #1 and Trading Company Employee #2, engaged in international bribery and money laundering schemes. In furtherance of those schemes, KOHUT, together with others, knowingly, willfully and corruptly agreed to offer and pay bribes on behalf of Trading Company to, and for the benefit of, Ecuadorian officials, in order to obtain and retain business for Trading Company. During the same time period, KOHUT, together with others, also agreed to knowingly conduct financial transactions designed to conceal and disguise the illegal bribery scheme and with the intent to promote the illegal bribery scheme.

15. In or about and between 2012 and the present, Petroecuador and the State-Owned Entities entered into a series of contracts in which the State-Owned Entities provided

5

loans to Petroecuador secured by oil to be delivered over a period of years.  Trading Company, in turn, entered into agreements with the State-Owned Entities to market and sell the oil products delivered pursuant to those contracts.

16.     During their respective tenures, Ecuadorian Official #1, Ecuadorian Official #2 and Ecuadorian Official #3 were involved in the negotiation, management or oversight of the contracts with the State-Owned Entities and were aware of the agreements between Trading Company and the State-Owned Entities.

17.     Beginning in or about 2012, the defendant RAYMOND KOHUT, Consultant #1 and others, including Trading Company Employee #1 and Trading Company Employee #2, and, beginning in or about 2014, Consultant #2, agreed and understood that Consultant #1 would pay bribes to Ecuadorian officials to, among other things, secure improper advantages for Trading Company in obtaining business related to Petroecuador.  These improper advantages included, among other things, (i) directing Petroecuador to award contracts to the State-Owned Entities under favorable terms so that Trading Company could then enter into its related agreements with the State-Owned Entities; and (ii) providing confidential, non-public information about Petroecuador that assisted Consultant #1, Consultant #2 and others in corruptly obtaining business for, and directing business to, Trading Company and others related to the contracts between Petroecuador and the State-Owned Entities.

18.     In furtherance of the bribery and money laundering schemes, among other things, the defendant RAYMOND KOHUT met with his co-conspirators, including Ecuadorian Official #1, Trading Company Employee #1, Trading Company Employee #2, Consultant #1 and Consultant #2, in the United States to discuss the Petroecuador contracts and their terms.

A.     Payments to Promote and Conceal the Schemes

19.     In or about and between 2012 to 2017, to promote the bribery scheme, to conceal the illegal proceeds of the bribery scheme and in furtherance of the money laundering scheme, Consultant #1 and Consultant #2 executed several corrupt consulting agreements with the Singaporean Subsidiary drafted, in part, by Trading Company Employee #2.  Pursuant to the consulting agreements, Singaporean Subsidiary paid the Consulting Companies a commission per barrel of Ecuadorian oil product that was delivered in connection with Petroecuador's contracts with the State-Owned Entities.  As part of the money laundering and bribery schemes, Consultant #1 and Consultant #2, while located in the United States and elsewhere, emailed invoices to the attention of the defendant RAYMOND KOHUT and others at Trading Company, Singaporean Subsidiary and Bahamian Subsidiary.  The invoices, which were reviewed and approved by employees of Trading Company and the two subsidiaries, contained transfer instructions with correspondent bank accounts that were located in the United States, including in New York, New York.

20.     In or about and between 2012 and 2019, the defendant RAYMOND KOHUT, together with others, including Trading Company Employee #1 and Trading Company Employee #2, caused Trading Company to make payments totaling more than $70 million to bank accounts controlled by Consultant #1 and Consultant #2 in Switzerland, the Cayman Islands and Panama that were intended to promote and conceal the bribery scheme and were in furtherance of the money laundering scheme.  KOHUT, Trading Company Employee #1 and Trading Company Employee #2 knew and intended that these payments would be used, at least in part, to pay bribes to Ecuadorian officials.  In total, in furtherance of the scheme, Consultant

7

#1 and Consultant #2 made bribe payments to Ecuadorian officials on behalf of Trading Company totaling at least $22 million.

21.     In furtherance of the money laundering scheme and to conceal the proceeds of the illegal bribery scheme, Consultant #1 and Consultant #2 made payments to domestic and offshore bank accounts in the names of shell companies for the benefit of Ecuadorian Official #1, Ecuadorian Official #2, Ecuadorian Official #3 and other Ecuadorian officials.  Some of those payments traveled through the Eastern District of New York and to and from correspondent bank accounts in New York, New York.

22.     From the inception of the bribery scheme in approximately 2012, Trading Company Employee #1 often instructed the defendant RAYMOND KOHUT to communicate about issues related to the bribery and money laundering schemes using their personal email accounts.   In addition, in their email communications regarding the schemes, KOHUT, Consultant #1 and Trading Company Employee #1 often referred to co-conspirators by code names rather than their actual names.

B.     Certain Acts In Furtherance Of The Schemes

23.     In furtherance of the bribery and money laundering schemes, among other things, the defendant RAYMOND KOHUT and his co-conspirators took the following acts, among others:

(a)     On or about October 13, 2014, Trading Company Employee #1 sent an email from a personal email account to KOHUT at his personal email account regarding a draft letter from a State-Owned Entity to Petroecuador, stating, "[Ecuadorian Official #1] is taking the lead on this one . . . we can edit it."

8

(b)     On or about November 28, 2014, KOHUT and others caused a wire transfer of approximately $1,971,970 from a bank account in Singapore, through correspondent accounts in the United States, including a correspondent account at a bank in New York, New York, into an account in Panama held by Consulting Company #1.

(c)     On or about May 26, 2016, KOHUT met with Ecuadorian Official #1, Consultant #1 and Consultant #2 at Consultant #1's house in Miami, Florida to discuss one of the Petroecuador contracts for which bribes would be paid.

(d)     On or about June 2, 2016, Consultant #1 and Consultant #2 caused a wire transfer of approximately $228,500 from a bank account in the Cayman Islands held by Consulting Company #1, through a correspondent account at a bank in New York, New York, into an account in Panama held by a close relative of Ecuadorian Official #1.

(e)     On or about September 20, 2016, KOHUT sent an email from his personal email account to Trading Company Employee #1 and Trading Company Employee #2 attaching a draft letter to be sent from one of the State-Owned Entities to Ecuadorian Official #1.  In the email, KOHUT informed Trading Company Employee #1 and Trading Company Employee #2 that Ecuadorian Official #1, referred to by his code name, "wants that [State-Owned Entity] raise the issue of pricing as a condition to agree to this deal.  BUT, he does not want this stated in the letter."

(f)     On or about April 18, 2018, KOHUT, Trading Company Employee #2, Consultant #1 and Consultant #2 met at a restaurant in Coral Gables, Florida to discuss certain of the contracts for which bribes would be paid.

9

(g)     On or about June 27, 2019, Consultant #1, while in the United States, caused a wire transfer of approximately $142,927 from a bank account in the Cayman Islands held by Consulting Company #1, through a correspondent account at a bank in New York, New York, into a bank account in Panama for the ultimate benefit of Ecuadorian Official #2 and Ecuadorian Official #3.

<u>CONSPIRACY TO COMMIT MONEY LAUNDERING</u>

24.     The allegations contained in paragraphs one through 23 are realleged and incorporated as if fully set forth in this paragraph.

25.     In or about and between 2012 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant RAYMOND KOHUT, together with others, did knowingly and intentionally conspire to commit offenses under Title 18, United States Code, Section 1956, to wit:

(a)     to transport, transmit and transfer, and attempt to transport, transmit and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of one or more specified unlawful activities, to wit: (i) felony violations of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3; and (ii) offenses against a foreign nation involving bribery of a public official, in violation of Articles 280 and 285 of the Ecuadorian Penal Code (collectively, the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and

10

(b)      to transport, transmit and transfer, and attempt to transport, transmit and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION

26.     The United States gives notice to the defendant that, upon his conviction of the offense charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

27.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the court;

(d)      has been substantially diminished in value; or

11

      (e)      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

      (Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))


MARK J. LESKO
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK


DEBORAH CONNOR
CHIEF, MONEY LAUNDERING AND ASSET RECOVERY SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE


DANIEL S. KAHN
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE